| | |
|---|---|
| Bad Attitude Department, LLC, | |
| Plaintiff, | **COMPLAINT FOR DECLARATORY RELIEF** |
| v. | |
| Q, LLC, | |
| Defendant. | |

## Introduction and Jurisdiction

1. This is an action brought under 28 U.S.C. § 2201. Plaintiff Bad Attitude Department, LLC ("Bad Attitude Department") seeks declaratory relief. Plaintiff is a limited liability company organized under the laws of the State of Illinois. Its principal place of business is in Lenoir, North Carolina. Plaintiff asks this Court to declare that its use of certain marks does not infringe any rights of Defendant Q, LLC ("Q"). Plaintiff also asks this Court to declare that its use does not tarnish or dilute any mark owned by Q. Plaintiff further asks this Court to declare that its use does not constitute unfair competition or palming off. Finally, Plaintiff asks this Court to declare that its use is protected speech under the First Amendment.

2. The Court has jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1337, and 1338. This action arises under the Lanham Act, 15 U.S.C. §§ 1051, et seq.

3. Venue is proper under 28 U.S.C. § 1391(b) and (c). A substantial part of the events giving rise to the claims occurred in this district. Plaintiff resides and operates in this district. Q is subject to personal jurisdiction in this district.

4. This Court has personal jurisdiction over Q, LLC. Q purposefully directed its activities at the State of North Carolina. Therefore, it has purposefully availed itself to the state of North Carolina and has established sufficient minimum contacts with this forum such that the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.

5. Q operates an interactive commercial website at www.liveqordie.com. Through that website, Q directs consumers to authorized dealers within North Carolina. Q also allows

1

customers to locate purchasing outlets within the state. Q has identified and directed consumers to at least two authorized dealers in the Charlotte, North Carolina area, specifically at 2001 Wilkinson Blvd, Charlotte, North Carolina, 28208 and 10430 Harris Oaks BLVD. STE H, Charlotte, North Carolina 28269. These activities constitute deliberate targeting of the North Carolina market.

6. Upon information and belief, other than those dealers listed above, there are other dealers including at least one in Spindale, NC, within this district.

7. Q sent a cease and desist letter to Bad Attitude Department's North Carolina office located in Caldwell County, alleging that Bad Attitude Department's Parody Products infringe Q's registered trademark and misappropriate its trade dress. See attached Exhibit 1.

8. Q's claims of infringement arise directly from, and out of, Q's contacts with this district. Q regularly supplies its products to dealers and customers within the Western District of North Carolina. Q directed its cease and desist letter at Plaintiff, a company that operates in this district. The sending of that demand letter to a party in this forum, targeting conduct occurring in this forum, itself constitutes a forum-directed act giving rise to the justiciable controversy at issue. The exercise of jurisdiction over Q is reasonable and does not offend traditional notions of fair play and substantial justice.

## Parties

9. Plaintiff Bad Attitude Department, LLC is a limited liability company organized and existing under the laws of the State of Illinois. Its principal place of business is at 724 Harrisburg Drive SW, Lenoir, North Carolina 28645.

10. Defendant Q, LLC is a limited liability company organized under the laws of the State of New Hampshire. Upon information and belief Q is engaged in the design, manufacture, and sale of firearms, silencers, noise suppressors, and firearm accessories.

## Facts

11. Bad Attitude Department is a small North Carolina firearms parts company that designs and sells AR-15 lower receivers and related components. Bad Attitude Department sells its products through its website, www.badattitudedept.com. It has developed a customer base within the firearms community.

2

12. Bad Attitude Department is an active and engaged participant in the firearms community. It closely follows events, personalities, and developments within the industry. In keeping with that engagement, Bad Attitude Department produces parody products that comment upon and criticize other organizations. For example, Bad Attitude Department previously produced and continues to sell patches parodying the "SHOT Show" trade organization. Those patches rebranded the organization as "Shit Show." That product line is representative of Bad Attitude Department's established history of parody and commentary within the industry. Or in other words, Bad Attitude Department lives up to its name of "Bad Attitude."

13. Q is a New Hampshire-based firearms company. Q's founder has cultivated a significant public persona within the firearms industry. He has done so through numerous videos, online appearances, podcasts, and public statements. By this conduct, Q's founder has voluntarily made himself a public figure and prominent personality within the firearms community. He has thereby subjected himself and Q to public commentary and criticism.

14. Q's founder's public conduct has generated substantial and longstanding criticism within the firearms community. On information and belief, a publicly available YouTube video depicts Q's founder telling a customer to "stfu" in response to a routine order status inquiry. Online discussion forums within the firearms community have extensively documented Q's founder's conduct.

15. Bad Attitude Department designed and sells a parody AR-15 lower receiver product line. The product line is branded as the "Q T Cat" (the "Parody Products"). The Parody Products are available at the following uniform resource locators: (1) https://badattitudedept.com/parody-ar15-lower-receiver-bad-attitude-department-q-t-cat-clear-anodized/ ; and (2) https://badattitudedept.com/parody-ar15-lower-receiver-bad-attitude-department-q-t-cat-ambi-clear-anodized/

16. A screenshot of the first uniform resource locator is as follows:

3



FIGURE 1

17. A screenshot of the second uniform resource locator is as follows:



FIGURE 2

18. The Parody Products consist of clear anodized AR-15 lower receivers. Each receiver bears a distinctive kitty-cat graphic. The graphic is a humorous, stylized feline figure. It is derived from Q's minimalist "Q" logo mark, while adding multiple additions including ears, whiskers, eyes, a nose, a mouth, facial markings, and words underneath. It is designed to comment upon and criticize the founder of Q. Below the feline graphic, the Parody Products include engraved text. That text reads: "NOT FRIENDLY DO NOT PET." This text directly references Q's and its founder's widely documented abrasive personality and industry conduct.

19. The kitty-cat graphic and the "NOT FRIENDLY DO NOT PET" engraving function as ornamental and decorative elements. They do not function as source identifiers or trademarks.

20. Furthermore, the modifications made to Q's "Q" logo in the feline graphic are substantial. The resulting image is so distinct from the original mark that it is not recognizable as a

5

"Q." A consumer unfamiliar with Q's mark would not identify the feline graphic as a derivative of that mark. The graphic functions as an independent expressive work rather than a source identifier.

21. In addition, the product name "Q T Cat" is phonetically identical to "Cutie Cat." That name is wholly inconsistent with the serious and masculine tone Q cultivates through its brand. See https://www.liveqordie.com/ (website shows an opening of guns and massive explosions). No consumer would associate the name "Cutie Cat" with Q's products or brand identity. The name itself reinforces the humorous and satirical nature of the Parody Products. It further negates any likelihood of consumer confusion.

22. The graphic is applied to the lower receiver in the same manner as decorative engravings commonly applied to firearms. Such ornamental engravings convey a message or artistic expression. They do not identify the manufacturer of the underlying product. The feline graphic serves an expressive and communicative function. It is a visual commentary on Q's "Q" logo and Q's founder's public persona. It is not used to identify Bad Attitude Department as the source of the goods. The "Bad Attitude Department" name and brand serve that source-identifying function.

23. The Parody Products reference Q's "Q" mark as the object of commentary and criticism. They do not use that mark as a source identifier for Bad Attitude Department's goods. The feline graphic uses Q's mark as its subject, the way a caricature uses a public figure's likeness. Its purpose is to ridicule Q's founder's public conduct and persona. That reference is artistically necessary. The commentary has no meaning without an allusion to its target. At the same time, the graphic creates unmistakable contrast. A humorous, stylized kitty-cat bearing the engraving "NOT FRIENDLY DO NOT PET" is wholly incompatible with Q's brand. Q cultivates a serious, tactical, and austere identity. That identity is irreconcilable with a parody kitty-cat product. No reasonable consumer familiar with Q's products could mistake the Parody Products for Q products. No such consumer would believe Q sponsored or endorsed the Parody Products. The kitty-cat graphic simultaneously references and distinguishes itself from Q's mark. That simultaneous reference and distinction is the defining feature of effective parody. It negates any likelihood of consumer confusion.

24. The Parody Products are not designed, advertised, or sold as Q products. They are sold under the "Bad Attitude Department" brand name on Plaintiff's own website. Product listings prominently identify Bad Attitude Department as the source and manufacturer. The word "PARODY" appears explicitly in the product name and uniform resource locators. The Parody Products are not positioned as affiliated with, sponsored by, or connected to Q in any way other than in a manner to make fun of the actions of Q's founder.

6

25. Bad Attitude Department has never tagged Q's official social media account in any post authored or paid for by Bad Attitude Department.

26. Plaintiff's customer base purchases the Parody Products with full understanding of their nature. Customers understand they are purchasing Bad Attitude Department products and that a lot of Bad Attitude Department products are designed to make fun of other organizations in the industry. Those products reflect humorous, critical commentary on Q and its founder. Plaintiff is unaware of any instance in which a consumer was confused as to the affiliation, sponsorship, or endorsement by Q of the Parody Products.

27. Furthermore, the concept of multi-color or clear or colored anodize firearms components is not proprietary to Q. Palmetto State Armory is a substantially larger firearms company. It offers a clear or colored-anodized firearm product marketed as the "Mixtape". That product bears a similar aesthetic to Q's products. Plaintiffs offer only clear anodized lower receivers, upper receivers, and handguards, not complete firearms.

28. On May 18, 2026, counsel for Q transmitted a cease and desist letter to Plaintiff (the "C&D Letter"). A copy is attached hereto as Exhibit 1. Q's counsel is Sean R. List, Esq., Chief Legal Officer of Q, LLC.

29. The C&D Letter alleges that Plaintiff is infringing Q's registered trademark "Q," U.S. Reg. No. 5,229,509, registered in 2017. That trademark covers "rifles, silencers for firearms, noise suppressors for guns, and firearm accessories." The C&D Letter also alleges misappropriation of Q's trade dress.

30. The C&D Letter demands that Plaintiff immediately cease all sales of the Parody Products. It also demands that Plaintiff cease all advertising and manufacturing of the Parody Products. It demands deletion of all website listings and social media posts. It demands that Plaintiff cease all commercial activities that connect Plaintiff to the Q brand. The compliance deadline set forth in the C&D Letter was June 1, 2026.

31. The C&D Letter threatens that Q will initiate formal legal proceedings with no further notice if Plaintiff fails to comply.

32. Q's claims of trademark infringement are without merit.

33. Q's claims of trade dress misappropriation are also without merit.

7

34. On information and belief, the C&D Letter was issued at least in part to suppress Plaintiff's First Amendment rights. Those rights include expression, commentary, and criticism directed at a public figure and company in the firearms industry.

35. Q knew that its C&D Letter was without merit, but choose to threaten litigation, in part to silence Bad Attitude Department from criticizing Q and its founder.

**First Cause of Action: Declaratory Relief**

*(28 U.S.C. § 2201; 15 U.S.C. §§ 1114, 1125)*

36. Plaintiff realleges the above paragraphs as if stated herein.

37. An actual and justiciable controversy exists between Plaintiff and Q. That controversy concerns the lawfulness of Plaintiff's Parody Products. Q has explicitly threatened legal action against Plaintiff and Q has not retracted its litigation threat. Plaintiff's continued sale of approximately 100 units currently in production are at direct and immediate risk.

38. Plaintiff's use of its Q T Cat feline graphic does not infringe any of Q's marks. This is true under sections 32 or 43 of the Lanham Act, 15 U.S.C. §§ 1114 and 1125. It is also true under any common law rights of Q. Plaintiff's use does not constitute unfair competition or palming off. This is so for the following reasons:

   a. The feline graphic is a substantially modified derivative of Q's minimalist "Q" logo. The modifications are extensive. The resulting image is not immediately recognizable as a "Q." A consumer unfamiliar with Q's mark would not identify the feline graphic as its derivative. The product name "Q T Cat" is phonetically identical to "Cutie Cat." That name is wholly inconsistent with the serious and masculine tone Q cultivates. No consumer would associate "Cutie Cat" with Q's brand identity.

   b. Plaintiff's use of the feline graphic is not a use of Q's mark as a mark. The kitty-cat graphic functions as a purely ornamental and decorative engraving on the lower receiver. Such ornamental engravings are commonly applied to firearms and firearm components. The graphic does not designate the source of Plaintiff's goods. It does not represent an affiliation with Q. It is not used to trade upon Q's goodwill. It is an expressive, critical, and humorous commentary on Q and its founder as a public figure in the firearms industry.

8

c. Plaintiff's use did not and will not create a likelihood of confusion among ordinary consumers. No ordinary consumer would be confused as to the source of the Parody Products. No ordinary consumer would be confused as to Q's sponsorship or endorsement of the Parody Products. The Parody Products are prominently sold under the "Bad Attitude Department" name. They are explicitly labeled "PARODY" in the product title. The relevant consumer base understands the commentary function of these products.

d. Q's mark is a single letter. Single-letter marks are conceptually weak. Q's mark does not meet the fame threshold under 15 U.S.C. § 1125(c). Q's reputation, while established within the firearms community, does not approach national fame. A weak mark is entitled to narrow protection.

e. Q cultivates a tone that is serious, gritty, and austere. That tone is reflected consistently throughout Q's website and brand materials. Bad Attitude Department, by contrast, cultivates an entirely different tone. Bad Attitude Department's brand is irreverent, humorous, and overtly comedic. Bad Attitude Department's own logo depicts a cat knocking an object off a table. That image captures the lighthearted and satirical tone that defines the brand. The two brands occupy entirely opposite ends of the tonal spectrum. No consumer could reasonably mistake Q's serious, tactical brand tone for Bad Attitude Department's comedic one. That stark contrast in tone further negates any likelihood of consumer confusion.

f. Plaintiff's use does not deceive as to the affiliation, connection, or association of Q with Plaintiff. Plaintiff is unaware of any instance of consumer confusion. No consumer has been confused as to the affiliation, sponsorship, or endorsement by Q. The Parody Products have been available for a sufficient period to generate confusion if any existed. None has materialized.

g. Plaintiff's use constitutes fair use within the meaning of 15 U.S.C. § 1115(b)(4). The feline graphic is used in its ornamental, expressive sense. It is not used as a trademark. It is used fairly and in good faith to comment upon, criticize, and parody Q and its founder.

39. Q's claimed trade dress rights are not protectable. The clear or colored anodized, multi-color appearance of Q's firearms components is not inherently distinctive. Alternatively, those design elements have not acquired secondary meaning exclusively identifying Q as the source, nor is there a registration in the United States Patent and Trademark Office for

9

it. The concept of clear or colored anodized multi-component firearm receivers is not exclusive to Q. For example, Palmetto State Armory's commercially available products demonstrate this point.

40. Furthermore, Q's mark does not meet the threshold under 15 U.S.C. § 1125(c) as a famous mark.

41. On information and belief, Q knew its claims were without merit when it sent the C&D Letter. On information and belief, the C&D Letter was issued at least in part to silence Plaintiff's First Amendment rights. Those rights include commentary and criticism directed at Q and its founder.

42. Plaintiff seeks a declaration from this Court on each of the following matters:

   A. First, Plaintiff asks the Court to declare that Bad Attitude Department has not infringed any mark owned by Q;
   B. Second, Plaintiff asks the Court to declare that Q's mark is not famous nor has been tarnished or diluted;
   C. Third, Plaintiff asks the Court to declare that its use does not constitute unfair competition or palming off;
   D. Fourth, Plaintiffs asks the Court to declare that Q, LLC has no protectable trade dress rights in the general aesthetic of clear or colored anodized AR-15 receiver components; and
   E. Fifth, Plaintiff asks the Court to declare that the Q T Cat feline graphic is protected under the First Amendment.

**Prayer for Relief**

**WHEREFORE**, Plaintiff prays that the Court enter Judgment in its favor and:

   A. Declare that Bad Attitude Department, LLC has not infringed any of Q, LLC's marks. This declaration shall apply to claims under the Lanham Act, 15 U.S.C. §§ 1051, et seq., and the common law;
   B. Declare that Q, LLC's mark is not famous nor has Bad Attitude Department, LLC tarnished or diluted any famous mark owned by Q, LLC;
   C. Declare that the use made by Plaintiff does not constitute unfair competition or palming off;
   D. Declare that Q, LLC has no protectable trade dress rights in the general aesthetic of clear or colored anodize AR-15 receiver components;

E. Declare that Plaintiff's use of the Q T Cat feline graphic is protected by the First Amendment;

F. Award Plaintiff its attorneys' fees under 15 U.S.C. § 1117(a) as this is an exceptional case; and

G. Award such other relief as may be just and proper.

Signed June 5th, 2026

/s/James P.A. Twisdale

James P.A. Twisdale
Twisdale Law, PC
324 E. St. John Street Suite B2
Spartanburg, SC 29302
704-995-6202
patrick@twisdalelaw.com
Attorney for Plaintiff

11