# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
#### Case No. 5:26-cv-127

BAD ATTITUDE DEPARTMENT, LLC,

        Plaintiff,

v.

Q, LLC,

        Defendant.

**DEFENDANT'S ANSWER AND COUNTERCLAIM**

Defendant Q, LLC ("Q"), by and through its undersigned counsel, files this Answer in response to Plaintiff Bad Attitude Department, LLC's ("Bad Attitude") Complaint as follows:

## ANSWER

## INTRODUCTION AND JURISDICTION

1. Q acknowledges that this is an action brought under 28 U.S.C. §§ 2201 and that Plaintiff seeks declaratory relief; however, Q denies that Plaintiff is entitled to any of the requested relief. Q lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 1 of the Complaint. They are, therefore, denied.

2. For purposes of this action only, Q admits that this Court has subject matter jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1337, and 1338. Q admits that this action arises under the Lanham Act, 15 U.S.C. §§ 1051, et seq.

3. Q does not dispute venue is proper for the purpose of this litigation and this litigation only.

4. Q does not dispute that this Court has personal jurisdiction over it for the purpose of this litigation and this litigation only. The remaining allegations in Paragraph 4 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, denied.

5. Q admits that it operates an interactive commercial website at www.liveqordie.com and has two authorized dealers in the Charlotte, North Carolina area. Q admits that it lists 2001 Wilkinson Blvd, Charlotte, North Carolina 28208 and 10430 Harris Oaks Blvd., Ste H, Charlotte, North Carolina in its dealer locator tool, meaning independently owned businesses located at those addresses have ordered Q products. Q denies the remaining allegations of Paragraph 5 of the Complaint.

6. Q admits that there may be dealers who buy products from third party distributors of Q products within this district, including at the addresses listed in Paragraph 5 of the Complaint. Q denies the remaining allegations of Paragraph 6 of the Complaint.

7. Q admits that it transmitted a cease-and-desist letter dated May 18, 2026, to Bad Attitude Department. The content of the letter otherwise speaks for itself.

8. Q does not dispute personal jurisdiction for the purposes of this litigation and this litigation only. Q admits that it transmitted a cease-and-desist letter dated May 18, 2026, to Bad Attitude Department. Q denies the remaining allegations of Paragraph 8 of the Complaint.

**PARTIES**

9. Q lacks knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 9 of the Complaint. They are, therefore, denied.

2

10. Q admits the allegations in Paragraph 10 of the Complaint.

**FACTS**

11. Upon information and belief after reviewing Bad Attitude's commercial website, Q admits that Bad Attitude offers AR-15 lower receivers and offers upper receiver components, complete upper receiver sets including barrels, firearm stocks, and a variety of parts meant to be used in the building of complete AR-15 type firearms. Additionally, Bad Attitude lists complete firearms for sale as depicted here: https://badattitudedept.com/bad-attitude-department-ar15-special-edition-fde/?searchid=0&search_query=stock. Q lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations set forth in Paragraph 11 of the Complaint. They are, therefore, denied.

12. Q lacks knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 12 of the Complaint. They are, therefore, denied.

13. Q admits that it is a New Hampshire-based firearms company. Q denies the remaining allegations set forth in Paragraph 13 of the Complaint.

14. Q lacks knowledge or information sufficient to form a belief regarding the truth of the allegations set forth in Paragraph 14 of the Complaint.

15. Q admits that Bad Attitude offers "QT Cat" AR-15 lower receivers and related products using the links provided by Bad Attitude in Paragraph 15 of the Complaint. Q lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations set forth in Paragraph 15 of the Complaint. They are, therefore, denied.

3

16. Upon information and belief, Q admits the allegations set forth in Paragraph 16 of the Complaint.

17. Upon information and belief, Q admits the allegations set forth in Paragraph 17 of the Complaint.

18. Q admits that Bad Attitude's products contain an image of Q's "Q" logo along with the text "NOT FRIENDLY DO NOT PET". Q denies the remaining allegations set forth in Paragraph 18 of the Complaint.

19. Q denies the allegations set forth in Paragraph 19 of the Complaint.

20. Q denies the allegations set forth in Paragraph 20 of the Complaint.

21. Q denies the allegations set forth in Paragraph 21 of the Complaint.

22. Q admits that the graphic in question is applied to the lower receiver on the magazine well, and that it is common for markings to appear in that area of a firearm to identify the manufacturer of said firearm. Q denies the remaining allegations set forth in Paragraph 22 of the Complaint.

23. Q admits that the products in question use Q's mark. Q denies the remaining allegations set forth in Paragraph 23 of the Complaint.

24. Q denies the allegations set forth in Paragraph 24 of the Complaint. Q specifically denies the products at issue are not positioned as affiliated with, sponsored by, or connected to Q. By way of further response, Bad Attitude Department appears to place its legally required manufacturer's engraving on the underside of the receiver and inside the trigger guard in

4

order to conceal the origin of product manufacture, while placing the Q mark prominently on the right side of the magazine well, which is where manufacturers' marks are most commonly placed.

25. Q denies that Bad Attitude Department has never tagged Q's official social media account. In regard to the remaining allegations set forth in Paragraph 25 of the Complaint, Q lacks knowledge or information sufficient to form a belief. They are, therefore, denied.

26. Q denies the allegations set forth in Paragraph 26 of the Complaint.

27. Q denies the allegations set forth in Paragraph 27 of the Complaint.

28. Q admits the allegations set forth in Paragraph 28 of the Complaint.

29. Q admits that it transmitted a cease-and-desist letter dated May 18, 2026, to Bad Attitude Department. The content of the letter otherwise speaks for itself.

30. Q admits that it transmitted a cease-and-desist letter dated May 18, 2026, to Bad Attitude Department. The content of the letter otherwise speaks for itself. To the extent the allegations in Paragraph 30 of the Complaint are inconsistent therewith, they are denied.

31. Q admits that it transmitted a cease-and-desist letter dated May 18, 2026, to Bad Attitude Department. The content of the letter otherwise speaks for itself. To the extent the allegations in Paragraph 30 of the Complaint are inconsistent therewith, they are denied.

32. Q denies the allegations set forth in Paragraph 32 of the Complaint.

33. Q denies the allegations set forth in Paragraph 33 of the Complaint.

5

34. Q denies the allegations set forth in Paragraph 34 of the Complaint.

35. Q denies the allegations set forth in Paragraph 35 of the Complaint.

**First Cause of Action: Declaratory Relief**
**(28 U.S.C. § 2201; 15 U.S.C. §§ 1114, 1125)**

36. Q repeats and realleges as if fully set forth herein its responses to the allegations in the paragraphs above.

37. Q admits that there is an actual and justiciable controversy between Bad Attitude and Q concerning the lawfulness of Bad Attitude's products as set forth in the Complaint. Q further admits that it has not retracted its litigation threat. Q lacks knowledge or information sufficient to form a belief regarding the truth of the remaining allegations set forth in Paragraph 37. They are, therefore, denied.

38. Q denies the allegations set forth in Paragraph 38 of the Complaint, including its subparts as follows:

   a. Q denies the allegations set forth of Paragraph 38(a) of the Complaint.

   b. Q denies the allegations set forth in Paragraph 38(b) of the Complaint.

   c. Q denies the allegations set forth in Paragraph 38(c) of the Complaint.

   d. Q denies the allegations set forth in Paragraph 38(d) of the Complaint.

   e. Q denies the allegations set forth in Paragraph 38(e) of the Complaint.

   f. Q denies the allegations set forth in Paragraph 38(f) of the Complaint.

g.  Q denies the allegations set forth in Paragraph 38(g) of the Complaint.

39. Q denies the allegations set forth in Paragraph 39 of the Complaint.

40. Q denies the allegations set forth in Paragraph 40 of the Complaint.

41. Q denies the allegations set forth in Paragraph 41 of the Complaint.

42. Q denies that Bad Attitude is entitled to any declaration set forth in Paragraph 42.

## PRAYER FOR RELIEF

Q denies each of Plaintiff's prayers for relief and prays for the relief set forth below in connection with its Counterclaims.

## <u>AFFIRMATIVE DEFENSES</u>

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim / Legal Insufficiency)

Plaintiff's Complaint fails to state a claim upon which declaratory relief may be granted. Without limitation, Plaintiff's claim that its use of Q's registered trademark is protected by the First Amendment fails as a matter of law because the First Amendment does not immunize the unauthorized commercial use of another's trademark as a source identifier on competing goods from liability under the Lanham Act.

### SECOND AFFIRMATIVE DEFENSE
### (Unclean Hands)

Plaintiff's claims for declaratory relief are barred, in whole or in part, by the equitable doctrine of unclean hands. Plaintiff deliberately adopted and commercially exploited a mark incorporating Q's federally registered and incontestable trademark on identical goods, placed the infringing mark in the location most commonly associated with manufacturer identification while

7

concealing its own manufacturer's engraving, and engaged in social media conduct designed to create an association with Q's brand — all with the intent to trade upon Q's substantial goodwill in the firearms marketplace.

**THIRD AFFIRMATIVE DEFENSE**
**(Estoppel)**

Plaintiff is estopped from obtaining a declaration of non-infringement because Plaintiff has acknowledged in its own Complaint that its product design is "derived from Q's minimalist 'Q' logo mark" and deliberately "references Q's 'Q' mark," and having knowingly adopted a mark derived from Q's protected trademark for use on goods identical to those covered by Q's registration, Plaintiff cannot now be heard to claim that its use is so dissimilar as to preclude a likelihood of confusion.

**FOURTH AFFIRMATIVE DEFENSE**
**(Good Faith Enforcement / No Exceptional Case)**

Q's cease and desist letter of May 18, 2026, was transmitted in good faith, based upon Q's valid, subsisting, and incontestable federal trademark rights under U.S. Registration No. 5,229,509, and in response to likelihood of consumer confusion in the marketplace regarding Plaintiff's products. Plaintiff's allegations that Q acted in bad faith or that this action constitutes an "exceptional case" warranting attorneys' fees under 15 U.S.C. § 1117(a) are without merit, and Q's enforcement of its intellectual property rights constitutes protected pre-litigation activity.

**FIFTH AFFIRMATIVE DEFENSE**
**(Reservation of Defenses)**

Q reserves the right to assert additional affirmative defenses as discovery and further investigation may warrant.

8

**COUNTERCLAIMS**

Q, LLC ("Q" or "Counterclaim Plaintiff"), by and through the undersigned attorneys, files this Counterclaim against Bad Attitude Department, LLC ("Bad Attitude" or "Counterclaim Defendant"), alleging, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

**INTRODUCTION**

1. This is an action for infringement of Q's federally registered, incontestable trademark,

   **Q** , under Section 32(1) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), for federal trademark and trade dress infringement and unfair competition and false designation of origin under 43(a) of the Lanham Act, and for substantial and related trademark infringement and unfair competition and deceptive trade practices under the statutory and common laws of the State of North Carolina, all arising from Bad Attitude's unauthorized use of Q's trademark in connection with the manufacture, distribution, marketing, advertising, promotion, offering for sale, and/or sale of Bad Attitude's identical goods.

2. At all times, Bad Attitude has been aware of, and intentionally chose, to adopt an identical version of the Q's trademark in an attempt to trade off Q's substantial goodwill in the marketplace.

3. Q seeks injunctive and monetary relief as set forth in greater detail below.

9

## JURISDICTION

4. This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121, 29 U.S.C. § 1331, and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

## VENUE

5. Venue is proper in this district because Bad Attitude resides and operates in this district.

## PARTIES

6. Q is a limited liability company formed under the laws of New Hampshire.

7. Upon information and belief, Bad Attitude is a limited liability company organized under the laws of Illinois with its principal place of business in Lenoir, North Carolina.

8. By filing its Complaint and having its principal place of business in this district, Bad Attitude has subjected itself to the personal jurisdiction of this Court.

## FACTS

### Plaintiff and the Q Mark

9. Q is a firearms and firearm component and accessory manufacturer offering, *inter alia*, firearms, sound suppressors, lower receivers, upper receivers, muzzle devices, firearm component parts, and shooting accessories. Q also sells a variety of soft goods, lifestyle accessories and clothing including, but not limited to, t-shirts and hats.

10. Q is known for developing their products from more expensive, higher quality materials than other firearm components and accessory manufacturers.

10

11. Additionally, Q conducts extensive quality control testing on all its products, including on their lower receivers, to ensure the quality of their products.

12. Q is the owner of the valid and subsisting United States Trademark Registration No. 5229509 on the Principal Register in the United States Patent and Trademark Office ("USPTO") for the trademark **Q** in connection with "rifles, silencers for firearms, noise suppressors for guns, the firearm accessories, namely, chamber flag indicators" and "clothing, namely, t-shirts, shirts, caps" which has become incontestable within the meaning of Section 15 of the Lanham Act, 15 U.S.C. § 1065 (the "Incontestable Mark"). Attached as Exhibit 1 is a true and correct copy of the registration certificate for Q's Incontestable Mark, which was issued by the USPTO on June 20, 2017.

13. Additionally, Q is the owner of the valid and subsisting United States Trademark Registration No. 6679304 on the Principal Register in the USPTO for the trademark **Q** for stickers and skateboards (collectively, with the Incontestable Mark, the "Q Mark"). Attached as Exhibit 2 is a true and correct copy of the registration certificate for Trademark No. 6679304, which was issued by the USPTO on March 22, 2022.

14. Q has used the Q Mark in commerce continuously since at least as early as 2016 in connection with the manufacture, provision, sale, marketing, advertising and promotion of firearms and associated accessories.

15. As a result of its widespread, continuous, and exclusive use of the Q Mark to identify its goods and Q as their source, Q owns valid and subsisting federal statutory and common law rights to the Q Mark.

11

16. The Q Mark is distinctive to both the public and the firearm industry.

17. Q has expended substantial time, money, and resources marketing, advertising, and promoting the goods sold under the Q Mark including through Q's social media, including, but not limited to, its Instagram account (@unpossible_by_q), its Facebook account (<facebook.com/profile.php?id=61561140753874>), and its YouTube channel (@qllc8143), and its website, <liveQordie.com>. Q has been featured in a variety of firearm publications both in digital and print media including, but not limited to, Guns & Ammo magazine, AR-15 magazine, and Precision Rifle Shooter magazine. Its products have been showcased extensively by influencers, with many videos featuring Q products having been viewed millions of times. Q actively exhibits at many trade shows and conferences in the shooting and hunting markets throughout the United States including, but not limited to, SHOT Show, Safari Club International, Dallas Safari Club, CanCon, and Western Hunt Expo.

18. Q sells its firearms, silencers, firearm components, shooting accessories, and soft goods through an extensive network of distributors, industry buying groups, and brick and mortar retailers across the United States. Q also maintains a robust e-commerce platform where many of its goods are sold directly to consumers.

19. The firearms, silencers, firearm components, shooting accessories, and soft goods sold under the Q Mark are of high quality—such as its Honey Badger and Boombox firearms, are machined from solid aluminum billet, rather than inferior forged aluminum—and have garnered substantial goodwill in the closely-knit firearms retail community.

20. As a result of Q's expenditures and efforts, the Q Mark has come to signify the high quality of the goods designated by the Q mark and acquired incalculable distinction, reputation, and goodwill belonging exclusively to Q.

21. Due to the reputation and goodwill associated with Q's brand, and the closely-knit firearm community, Q often collaborates with other retailers in the firearms, shooting, or tactical gear space.

22. Just some of many current and past collaborations are as follows:

    a. A collaboration with Kerry Kelley for a limited-edition belt buckle bearing the Q Mark.



;

    b. A collaboration with Armageddon Gear for a shooting bag bearing the Q Mark.



;

c. A collaboration with Piece of Mind Guns, wherein the two companies combined their respective logos.



;

d. A collaboration with Snakebit Knives for a knife containing both the Q Mark and Snakebit Knives' logo.

14

.

23. In addition to Q's collaborative nature and strong industry presence, Q maintains a reputation for being clever, provocative, adversarial, and antagonistic by offering tongue-in-cheek commentary and product names.

24. Q's products are often named something clever, sardonic, or funny.

25. For example, in addition to the Q Mark, Q offers or has offered several uniquely named items including, but not limited to:

    a.  PORQ CHOP in connection with silencers;

    b.  G SLING in connection with a multicam sling ;

    c.  SLINGLEBERRY in connection with a sling adapter;

    d.  REAREND in connection with muzzle devices;

    e.  BIG BUTT PAD in connection with rifle padding;

    f.  SWOLLEN POSSE in connection with a sling; and

    g.  SIDE CHICK in connection with a firearms chassis system.

15

26. One of the most popular and distinct features of Q's firearms is their gold-colored clear anodized upper and lower receivers.

27. Gold-colored clear anodized lower and upper receivers have become synonymous with the Q brand, such that consumers believe that any gold-colored, clear anodized receiver would be a Q product. Additionally, Q puts the Q Mark in the center of the magazine well on the lower receiver for consumers to easily recognize (collectively, the "Q Trade Dress").



28. Neither gold-colored clear anodization nor the inclusion of Q branding in the center of the lower receiver's magazine well are essential to the use or purpose of the lower receiver.

29. Given Q's unique gold-colored clear anodized firearms and firearms parts used in connection with the visible Q Mark, the Q Trade Dress has acquired distinctiveness through its continuous and exclusive use, establishing its place in the market.

30. As part of its marketing and originality, Q's persona may be described as gruff and straightforward, which Q members and employees embrace as part of their brand.

16

31. Q's reputation in the market is based in large part on its high quality products and clever branding.

Defendant's Unlawful Activities

32. Upon information and belief, Bad Attitude is also a firearms and firearm component and accessory manufacturer.

33. Without Q's authorization and knowing Q's protectable exclusive rights in its Q Mark, Bad Attitude began using the Q Mark with a cat face (hereinafter, the "Infringing Mark") with the words "NOT FRIENDLY DO NOT PET" in connection with the marketing and sale of identical goods.

34. The Infringing Mark is printed on a variety of Bad Attitude products, including but not limited to, firearm lower receivers, t-shirts, and hats.



35. Further, Bad Attitude named the Infringing Mark the "QT Cat" in an obvious reference and implication that Bad Attitude is associated with or authorized by Q to use the Infringing Mark.

36. The Infringing Mark adopted and used by Bad Attitude is confusingly similar to the Q Mark, as it intentionally incorporates the Q Mark's design aspects.

37. Additionally, Bad Attitude provides its legally required manufacturer's engraving on the underside of the receiver and inside the trigger guard which conceals the true origin of the product's manufacture.

38. The placement of the manufacturing details makes it harder to see the manufacturer and instead makes the Infringing Mark the only clearly visible source identification on the product when it is installed and in use.

39. Upon information and belief, Bad Attitude has manufactured, distributed, provided, marketed, advertised, promoted, offered for sale, and sold firearms, firearm components, t-shirts, and hats under the Infringing Mark.

40. Furthermore, Bad Attitude has manufactured, distributed, provided, marketed, advertised, promoted, offered for sale, and sold firearms, firearm components, t-shirts and hats under the Infringing Mark via social media and Bad Attitude's online retail store <badattitudedept.com>.

41. These infringing goods are being marketed and targeted to Q's consumer base.

18

42. Consumers have posted questions on social media regarding whether the Bad Attitude products with the Infringing Mark are part of a "Q collab."



43. Bad Attitude also displays the Infringing Mark on product packaging, leading to further confusion.



44. Further, Bad Attitude finishes its lower receiver with gold-colored clear anodization, making the mark the same color as Q's, which bears the Infringing Mark in an identical location.

45. Not only would consumers be confused by the identical gold color, but the location of the Infringing Mark infringes the Q Trade Dress.

46. On or about May 18, 2026, Q sent a cease-and-desist letter to Bad Attitude objecting to Bad Attitude's use of the Infringing Mark. Attached hereto as Exhibit 3 is a true and correct copy of Q's cease and desist letter to Bad Attitude.

47. To date, Q has received no response to its cease-and-desist letter.

20

48. Rather, Bad Attitude filed a declaratory judgment action against Q.

49. Bad Attitude's infringing acts alleged herein have caused and are likely to continue to cause confusion, mistake, and deception among the relevant consuming public as to the source of origin of Bad Attitude's goods and have and are likely to continue to deceive the relevant consuming public into believing, mistakenly, that Bad Attitude's goods originate from, are associated or affiliated with, or otherwise authorized by Q.

50. Upon information and belief, Bad Attitude's acts are willful with deliberate intent to trade on the goodwill of Q's Q Mark, cause confusion and deception in the marketplace, and divert potential sales of Q's goods to Bad Attitude.

51. Bad Attitude's acts are causing and, unless restrained, will continue to cause damage and immediate irreparable harm to Q and to its valuable reputation and goodwill with the consuming public for which Q has no adequate remedy at law.

**COUNT I**
**Trademark Infringement – 15 U.S.C. § 1114**

52. Q restates and incorporates the averments set forth in the above paragraphs as if fully set forth herein.

53. The Q Mark and the goodwill of the business associated with them in the United States is of great value, is highly distinctive, and has become universally associated in the tactical firearms and hunting markets with Q's products of the very highest quality and reputation.

21

54. Bad Attitude has manufactured, distributed, offered for sale, advertised, and/or marketed products to the consuming public using the Infringing Mark in direct competition with Q's provision of goods under the Q Mark, in or affecting interstate commerce.

55. Bad Attitude's unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Bad Attitude's goods, and is likely to cause consumers to believe, contrary to the facts, that Bad Attitude's goods are sold, authorized, endorsed, or sponsored by Q, or that Bad Attitude is in some way affiliated with or sponsored by Q. Bad Attitude's conduct therefore constitutes trademark infringement in violation of Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(1).

56. Upon information and belief, Bad Attitude has committed the foregoing acts of infringement with full knowledge of Q's prior rights in the Q Mark and with the willful intent to cause confusion and trade on Q's goodwill.

57. Bad Attitude made a conscious choice to copy the Q Mark and develop its infringing and competing products.

58. Bad Attitude's conduct is causing immediate and irreparable harm and injury to Q, and to its goodwill and reputation, and will continue to both damage Q and confuse the public unless enjoined by this court. Q has no adequate remedy at law.

59. Q is entitled to, among other relief, injunctive relief and an award of actual damages, Bad Attitude's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of

22

the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT II
### Unfair Competition and False Designation of Origin

60. Q restates and incorporates the averments set forth in the above paragraphs as though fully set forth herein.

61. Bad Attitude's unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Bad Attitude's goods, and is likely to cause consumers to believe, contrary to fact, that Bad Attitude's goods are sold, authorized, endorsed, or sponsored by Q, or that Bad Attitude is in some way affiliated with or sponsored by Q.

62. Bad Attitude's unauthorized use in commerce of the Infringing Mark as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

63. Upon information and belief, Bad Attitude's conduct as alleged herein is willful and is intended to, is likely to, and has in fact, caused confusion, mistake, or deception as to the affiliation, connection, or association of Bad Attitude and/or its products with Q.

64. Bad Attitude's conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

23

65. Bad Attitude's conduct as alleged herein is causing immediate and irreparable harm and injury to Q, and to its goodwill and reputation, and will continue to both damage Q and confuse the public unless enjoined by this Court. Q has no adequate remedy at law.

66. Q is entitled to, among other relief, injunctive relief and an award of actual damages, Bad Attitude's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116,1117, together with prejudgment and post-judgment interest.

## COUNT III
### Common Law Trademark Infringement

67. Q restates and incorporates the averments set forth in the above paragraphs as if fully set forth herein.

68. As a result of Q's hard work and investments in producing, providing, and promoting its goods associated with the Q Mark, Q has built up valuable goodwill in the Q Mark. As such, the Q Mark has become associated with Q's goods and services and has come to symbolize the reputation for quality and excellence of Q goods and services.

69. Bad Attitude's unauthorized use of the Infringing Mark is being made with Bad Attitude's knowledge of Q's well-known and prior rights in the Q Mark.

70. Bad Attitude's unauthorized use of the Q Mark is likely to cause confusion or deceive the consuming public and the purchasers in the firearm industry under the common law of the State of North Carolina, and the laws of the United States.

24

71. Bad Attitude's acts constitute willful infringement of Q's exclusive rights in the Q Mark, in violation of state common law.

72. Q has been and will continue to be harmed by Bad Attitude's wrongful conduct.

73. In light of Q's significant and longstanding investment in its reputation for quality, the goodwill created by that investment, and the customer relationships undermined by Bad Attitude's aforesaid acts, Bad Attitude has irreparably harmed Q in ways not readily compensated by monetary damages and will continue to irreparably harm Q in this manner unless enjoined by the Court, as a result of which Q is without adequate remedy at law.

74. As a direct and proximate result of Bad Attitude's deliberate and intentional infringement, Q continues to suffer injury in an amount not yet ascertained.

**COUNT IV**
**North Carolina Unfair and Deceptive Trade Practices Act – N.C.G.S. §§ 75-1 - 75-42**

75. Q restates and incorporates the averments set forth in the above paragraphs as though fully set forth herein.

76. Bad Attitude has manufactured, distributed, offered for sale, advertised, and/or marketed products to the consuming public using the Infringing Mark in direct competition with Q's provision of goods under the Q Mark, in or affecting North Carolina commerce.

77. Bad Attitude's unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Bad Attitude's goods, and is likely to cause consumers to believe, contrary to fact, that Bad

Attitude's goods are sold, authorized, endorsed, or sponsored by Q, or that Bad Attitude is in some way affiliated with or sponsored by Q.

78. Upon information and belief, Bad Attitude's conduct as alleged herein is willful and is intended to, is likely to, and has in fact, caused confusion, mistake, or deception as to the affiliation, connection, or association of Bad Attitude and/or its products with Q.

79. Bad Attitude's conduct as alleged herein is causing immediate and irreparable harm and injury to Q, and to its goodwill and reputation, and will continue to both damage Q and confuse the public unless enjoined by this Court.

**COUNT V**
**Trade Dress Infringement – 15 U.S.C. § 1125(a)**

80. Q restates and incorporates the averments set forth in the above paragraphs as if fully set forth herein.

81. The Q Trade Dress has acquired distinctiveness throughout Q's exclusive market use associated with its lower receivers and complete firearms.

82. The Q Trade Dress has garnered substantial goodwill, making it universally associated in the minds of the purchasers in the firearms and hunting markets with Q's high quality lower receivers and firearms.

83. Bad Attitude has manufactured, distributed, offered for sale, advertised, and/or marketed products to the consuming public consisting of the Q Trade Dress in direct competition with Q, in or affecting interstate commerce.

26

84. Bad Attitude's unauthorized use in commerce of Q's Trade Dress as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Bad Attitude's goods, and is likely to cause consumers to believe, contrary to the facts, that Bad Attitude's goods are sold, authorized, endorsed, or sponsored by Q, or that Bad Attitude is in some way affiliated with or sponsored by Q. Bad Attitude's conduct therefore constitutes trade dress infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

85. Upon information and belief, Bad Attitude has committed the foregoing acts of infringement with full knowledge of Q's prior rights to the Q Trade Dress and with the willful intent to cause confusion and trade on Q's goodwill.

86. Bad Attitude made a conscious choice to copy the Q Trade Dress and develop its infringing and competing products.

87. Bad Attitude's conduct is causing immediate and irreparable harm and injury to Q, and to its goodwill and reputation, and will continue to both damage Q and confuse the public unless enjoined by this court. Q has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Q requests judgment against Bad Attitude as follows:

1. That Bad Attitude has violated Section 32 of the Lanham Act (15 U.S.C. § 1114) and Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a));

2. That Bad Attitude has infringed Q's common law trademark rights;

3. That Bad Attitude has violated N.C.G.A. § 75-1.1;

27

4. Granting an injunction permanently enjoining Bad Attitude, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise from:

a. Manufacturing, distributing, providing, selling, marketing, advertising, promoting, or authorizing any third party to manufacture, distribute, sell, market, advertise, or promote any of Bad Attitude's goods or services bearing the Infringing Mark or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the Q Mark or the Q Trade Dress;

b. Engaging in any activity that infringes Q's rights in the Q Mark or the Q Trade Dress;

c. Engaging in any activity constituting unfair competition with Q;

d. Making or displaying any statement, representation, or depiction that is likely to lead the public or the trade to believe that (i) Bad Attitude's goods are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with Q, or (ii) Q's goods are in any manner approved, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with Bad Attitude;

e. Using or authorizing any third party to use any false description, false representation, or false designation of origin, or any marks, names, words, symbols,

28

devices or trade dress that falsely associate such business, goods and/or services with Q or tend to do so;

f. Registering or applying to register any trademark, service mark, domain name, trade name, or other source identifier or symbol of origin consisting of or incorporating the Infringing Mark or any other mark that infringes or is likely to be confused with the Q Mark or the Q Trade Dress, or any goods or services of Q or Q as their source; and

g. Aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (a) through (f).

5. Granting such other and further relief as the Court may deem proper to prevent the public and trade from deriving the false impression that any goods or services manufactured, sold, distributed, licensed, marketed, advertised, promoted, or otherwise offered or circulated by Bad Attitude are in any way approved, endorsed, licensed, sponsored, authorized or franchised by, or associated, affiliated, or otherwise connected with Q or constitute or are connected with Q's goods;

6. Directing Bad Attitude to immediately cease all manufacture, display, distribution, marketing, advertising, promotion, sale, offer for sale, and/or use of any and all packaging, labels, advertisements, signs, displays, and other materials that feature or bear any designation or mark incorporating the Infringing Mark or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the Q Mark or the Q Trade Dress, and to direct all distributors, retailers, wholesalers, and other

29

individuals and establishments wherever located in the United States that distribute, advertise, promote, sell, or offer for sale Bad Attitude's goods or services to cease forthwith the display, distribution, marketing, advertising, promotion, sale, and/or offering for sale of any and all goods, services, packaging, labels, containers, advertisements, signs, displays, and other materials featuring or bearing the Infringing Mark or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the Q Mark, and to immediately remove them from public access and viewing;

7. Directing that Bad Attitude recall and deliver up for destruction or other disposition all goods, packaging, advertisements, promotions, signs, displays, and related materials impropriating or bearing the Infringing Mark or any other mark that is a counterfeit, copy, confusingly similar variation, or colorable imitation to the Q Mark or the Q Trade Dress;

8. Directing, pursuant to Section 35(a) of the Lanham Act (15 U.S.C. § 1116(a)), Bad Attitude to file with the Court and serve upon Q's counsel within thirty (30) days after service on Bad Attitude of an injunction in this action, or such extended period as the Court may direct, a report in writing under oath, setting forth in detail the manner and form in which Bad Attitude has complied therewith;

9. Awarding Q an amount of to three times the amount of its actual damages, in accordance with Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a));

10. Directing that Bad Attitude account for and pay over to Q all profits realized by its wrongful acts in accordance with Section 35(a) of the Lanham Act (15 U.S.C. § 1117(a)), enhanced as appropriate to compensate Q for the damages caused thereby;

11. Awarding Q punitive and exemplary damages as the Court finds appropriate to deter any future willful infringement;

12. Declaring that this is an exceptional case pursuant to 35(a) of the Lanham Act and awarding Q its costs and reasonable attorneys' fees thereunder (15 U.S.C. § 1117(a));

13. Awarding Q interest, including prejudgment and post-judgment interest, on the foregoing sums; and

14. Awarding any such other and further relief as the Court deems just and proper.

Respectfully submitted this the 21st day of July, 2026.

BELL, DAVIS, & PITT, P.A.

*/s/  Marc E. Gustafson*
Marc E. Gustafson, N.C. Bar No. 34429
Bell, Davis, & Pitt, P.A.
227 West Trade Street, Suite 1800
Charlotte, NC 28202
Telephone: (704) 227-0400
Email: mgustafson@belldavispitt.com


EVERSHEDS SUTHERLAND (US) LLP

Peter G. Pappas (Admitted *pro hac vice*)
Cameron Murphey (Admitted *pro hac vice)*
Melanie K. Lane (Admitted *pro hac vice*)
Eversheds Sutherland (US) LLP
600 Peachtree St., NE, Suite 5200
Atlanta, GA 30308
Tel.: (404) 853-8000
Email: petepappas@eversheds-sutherland.us
cameronmurphey@eversheds-sutherland.us
melanielane@eversheds-sutherland.us
*Attorneys for Defendant/Counterclaim Plaintiff Q, LLC*

31

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document, filed through the CM/ECF system, will be electronically served on all counsel who are registered users of CM/ECF on July 21, 2026.

This the 21st day of July, 2026.

*/s/ Marc E. Gustafson*
Marc E. Gustafson

32