**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**Case No. 5:26-cv-127**

BAD ATTITUDE DEPARTMENT, LLC,

Plaintiff,

v.

Q, LLC,

Defendant.

**MOTION FOR PROTECTIVE ORDER**

Q, LLC ("Q"), by and through undersigned counsel, moves the Court to issue a protective order, in the form attached as Exhibit A, that will govern the disclosure and use of confidential, sensitive, and proprietary information produced by the parties. The parties do not dispute that a protective order should be entered into in this case. However, there is dispute as to the scope of protections, specifically as it relates to in-house counsel. Q, LLC provides as follows:

## Facts and History

Q is a manufacturer of firearms and firearm components, a highly regulated industry that requires specialized knowledge. Q has been operating for over a decade and has garnered considerable goodwill and notoriety in the field. Q has been using the trademark, (the "Q Trademark") in connection with its goods since its inception. Q owns the valid and subsisting United States Registration No. 5229509 for the Q Trademark, which has become incontestable. Q also owns an identical valid and subsisting trademark (Registration No. 6679304) for additional goods.

Q operates with approximately 120 employees, including one in-house counsel, Mr. Sean List. (*See* Exhibit B, Declaration of Sean List ("List Decl.") at ¶¶ 5, 8). Mr. List is barred in New Hampshire and admitted to practice in the United States District Court for the District of New Hampshire and the United States Court of Appeals for the First Circuit. *Id.* ¶ 3. Mr. List was a trial attorney for approximately ten (10) years prior to going in-house, and his admission remains in good standing. *Id.* ¶¶ 3-4. Mr. List initially began as a contracted General Counsel for Q in June 2023 and became Q's full-time Chief Legal Officer in April 2025. *Id.* ¶ 5.

Q maintains a legal department separate from its marketing, quality control, production, software development, and engineering teams. *Id.* ¶¶ 10-11. Q's marketing, quality control, production, software development, and engineering departments all report to the president of Q. *Id.* ¶ 10. Conversely, the legal, export, compliance, and human resources departments are siloed and do not report to the president of Q. *Id.* ¶ 11. Q's legal department is kept intentionally separate from the main business unit by having its own encrypted file system that is not accessible outside of the legal department. *Id.* ¶ 12. Not even the information technology ("IT") team has the credentials to access the system. *Id.* The purpose of the system is to maintain confidentiality, and the system is inaccessible to the president, the Board of Managers, and any individual in the sales, marketing, or engineering departments. *Id.* ¶ 13.

Without authorization, Bad Attitude Department, LLC ("Bad Attitude") adopted a mark that used the Q Trademark along with a cat face in connection with identical goods. In response, Q sent a cease-and-desist letter to Bad Attitude on or about May 18, 2026, demanding that Bad Attitude cease use of the mark, as it infringed the Q Trademark. Bad Attitude did not respond to the letter but instead filed a declaratory judgment action against Q on or about June 5, 2026,

claiming the mark to be a "parody." (Dkt. 1). Q filed its Counterclaim, asserting trademark and trade dress infringement. (Dkt. 14).

The parties held a preliminary discovery conference on or about August 27, 2026, wherein the parties agreed to enter into a protective order (Dkt. 16). The Case Management Order filed September 3, 2026, provided a deadline to submit any proposed protective order on or before November 13, 2026. (Dkt. 18).

Q, through undersigned counsel, sent a standard draft protective order to Bad Attitude on October 19, 2026. Bad Attitude, through its counsel, sent back proposed edits. (*See* Exhibit C). One proposed edit was the removal of in-house counsel as permitted individuals to view documents labeled "Confidential - Attorneys Eyes Only" ("AEO"). *Id.* Although Q acquiesced to most of the proposed edits, Q was concerned regarding the removal of in-house counsel as a permitted viewer of AEO materials. *Id.* Q explained that given the highly specialized industry, it is important and helpful for in-house counsel to see all information with minimal prejudice given that in-house counsel is bound by the same ethical obligations as external counsel. *Id.*

In response, Bad Attitude's counsel expressed the concern for "inadvertent competitive use" by legal counsel. *Id.* Given Bad Attitude's concerns, Q provided information on its internal structure. *Id.* Specifically, Q is a business made up of approximately 120 individuals. *Id.* The departments are divided by, on the one hand, sales, marketing, and engineering, which report to the president, and, on the other hand, legal, export, compliance, and human resources, which do not. *Id.* For purposes of "inadvertent competitive use," there was no overlap in the decision making, and therefore Q did not believe there was an issue. *Id.*

In response, Bad Attitude's counsel simply responded "I still do not agree with allowing in-house counsel, as with a small organization like that, I know the practicality of what happens. I

do not believe it is appropriate for AEO classified documents to be provided directly to your client. I am not able to review in detail." *Id.* Bad Attitude provided no further comment.

In a good faith effort to resolve the dispute, Q's counsel provided 4th Circuit case law that showed the test of whether in-house counsel is involved in "competitive decision making." *Id.* Q requested any concrete concerns regarding the decision-making power of Q's singular in-house counsel, as Q had explained the siloed divisions and suggested a meet and confer. *Id.* Rather than focusing on concrete evidence regarding the singular counsel that would be affected, Bad Attitude's counsel inappropriately and irrelevantly made attacks as to other individuals working for Q. *Id.* None of these allegations made any connection to competitive decision making. *Id.*

Once more, Q's counsel provided additional information, stating that Q's "legal department maintains an encrypted server that is not accessible outside of the department." *Id.* Q further stated that if any further description or clarification was needed, Q was happy to accommodate. *Id.* Bad Attitude responded solely with its availability for the requested meet and confer. *Id.*

As such, the parties' respective counsel held a meet and confer on or about November 9, 2026. During the call, Bad Attitude's counsel maintained its refusal to accept the proposed inclusion because the company was "small" and Q's in-house counsel likely wore many hats. Bad Attitude's seemingly sole basis for this argument was Q's in-house counsel's LinkedIn page, wherein counsel provides a broad definition of his position within Q, which describes the typical functions of in-house counsel. (*See* Exhibit D).

Despite counsel's numerous assurances that it would provide relevant documentation on regulations and procedures or other information Bad Attitude requested, Bad Attitude adamantly refused to consider the adoption.

Therefore, Q brings this motion, requesting that the Court enter the proposed protective order attached as Exhibit A, including in-house counsel as an authorized recipient of AEO materials.

**Legal Authority**

"A party. . . may move for a protective order in the court where the action is pending." Fed. R. Civ. P. 26(c)(1). "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." *Id.*

Courts have consistently held that in-house counsel may have access to confidential information. *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984); *Thompson Auto. Labs, LLC v. Illinois Tool Works, Inc.*, No. 5:15-CV-282-FL, 2016 WL 11805996 (E.D.N.C. Sept. 21, 2016). "The decisive factor in denying in-house counsel access is whether the in-house counsel is involved in 'competitive decisionmaking.'" *Glaxo Inc. v. Genpharm Pharms., Inc.*, 796 F. Supp. 872, 874 (E.D.N.C. 1992). "'Competitive decisionmaking' is shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Thompson Auto. Labs* at 2 (internal citations omitted).

"In order to protect 'Highly Confidential' information from in-house counsel's view, [Bad Attitude] must make a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements that it would be harmed competitively by in-house counsel's access to the confidential information." *Irwin Indus. Tool Co. v. Worthington Cylinders*

*Wisconsin, LLC*, No. CIV. 3:08CV291, 2009 WL 606190, at 2 (W.D.N.C. Mar. 9, 2009). Courts have held that it is an "error to deny access solely because of in-house counsel's 'general position.'" *Thompson Auto. Labs* at 3.

## Legal Argument

The parties agree that a protective order should be entered. The only dispute is whether Q's sole in-house counsel, Mr. Sean List, may serve as an authorized recipient of AEO materials. Rule 26(c) gives the Court authority, for good cause, to require that confidential commercial information "be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1). The proposed protective order does exactly that. It allows confidential information to be disclosed in a controlled way while still letting Q's in-house counsel take part in defending and prosecuting this case. Because Mr. List is not involved in competitive decisionmaking, and because Bad Attitude has offered only stereotyped and conclusory objections, the Court should enter the protective order attached as Exhibit A.

### I. Good Cause Supports a Protective Order That Includes In-House Counsel as an Authorized AEO Recipient.

Good cause exists for the protective order as proposed. Both parties have recognized that discovery in this case will involve confidential, sensitive, and proprietary information, and they agreed at the preliminary discovery conference to enter a protective order. (Dkt. 16). The only question is how that information is to be "revealed . . . in a specified way." Fed. R. Civ. P. 26(c)(1). Q's proposed order answers that question with a tailored framework. AEO materials can be viewed by outside counsel and by Q's single in-house attorney, who is bound by the same ethical obligations as outside counsel and who works in a legal department structurally walled off from Q's business operations. (List Decl. ¶¶ 11-13). Rule 26(c) is meant to protect parties from undue

burden and to tailor how disclosure occurs, not to deprive a party of meaningful participation by its own counsel when the record does not show any real risk of misuse.

Good cause also supports including in-house counsel because Q operates in a highly regulated industry that requires specialized knowledge. Q manufactures firearms and firearm components. Q has explained to Bad Attitude that, given this specialized industry and the nature of the claims, it is important and helpful for in-house counsel to see all information, and that doing so causes minimal prejudice. Not only is in-house counsel bound by the same ethical obligations as outside counsel, but the nature of present claims is surrounding Bad Attitude's infringement of Q's trademarks and trade dress. The claims surround Q's trademark and trade dress. There is no claimed trade secret or other information that would necessarily create a concern for in-house counsel to see information.

Without access to AEO materials, Q's only in-house attorney could not fully evaluate the evidence underlying Bad Attitude's declaratory judgment claims and Q's counterclaims for trademark and trade dress infringement. (Dkt. 1; Dkt. 14).

## II. Mr. List Is Not Involved in Competitive Decisionmaking.

Courts have consistently held that in-house counsel may have access to confidential information. *U.S. Steel Corp.*, 730 F.2d 1465; *Thompson Auto. Labs*, 2016 WL 11805996. "The decisive factor in denying in-house counsel access is whether the in-house counsel is involved in 'competitive decisionmaking.'" *Glaxo*, 796 F. Supp. at 874. That term covers counsel's "advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Thompson Auto. Labs* at 2. The inquiry therefore looks at the attorney's actual activities, associations, and relationship with the client, not at the attorney's title or the size of the company.

Measured against that standard, Mr. List is not a competitive decisionmaker. Q's organizational structure separates its legal function from the business functions that make the kinds of decisions the test identifies, such as pricing and product design. At Q, those decisions sit with the sales, marketing, quality control, production, software development, and engineering departments, which all report to Q's president. (List Decl. ¶ 10). Q's legal department is separate from the marketing, sales, quality control, production, software development and engineering teams. *Id.* ¶¶ 10-12. Q's legal, export, compliance, IT, and human resources departments are siloed and do not report to the president. *Id.* ¶ 11; *see also* Exhibit C. As Q explained to Bad Attitude, there is no overlap in decisionmaking between these two sides of the organization. (Exhibit C). Mr. List's reporting line therefore does not run through the people who make Q's pricing, marketing, or product-design decisions.

Q's safeguards go beyond reporting lines. The legal department keeps its own encrypted file system that is not accessible outside the department. (List Decl. ¶ 12; Exhibit C). Not even Q's IT team has the credentials to access it. (List Decl. ¶ 12). The system exists to maintain confidentiality, and it is inaccessible to Q's president, Q's Board of Managers, and anyone in sales, marketing, or engineering. *Id.* ¶ 13. AEO materials provided to Mr. List would be stored in that system. *Id.* ¶ 17. As a result, the individuals who make Q's pricing, marketing, and product-design decisions would have no means of retrieving Bad Attitude's AEO information, even if Mr. List were absent or the information were misfiled. That is a physical and technical barrier, separate from and in addition to the organizational one. Under *Glaxo* and *Thompson Auto. Labs*, the question is whether counsel's role creates a real risk that a competitor's information will inform business decisions. Q's structure and storage controls together answer that question with specific facts.

Mr. List's professional obligations add a further, independent layer of protection. He is barred in New Hampshire, admitted to practice in the United States District Court for the District of New Hampshire and the United States Court of Appeals for the First Circuit, and practiced as a trial attorney for ten years before going in-house. (List Decl. ¶¶ 3-4). His admission remains in good standing. (*Id.* ¶ 3). Like outside counsel, he is bound by his ethical obligations, and he would also be personally bound by the terms of the protective order, so any misuse of AEO materials would expose him to professional discipline and to the Court's enforcement of its own order. The proposed order also limits the in-house access Q seeks to a single attorney. Q does not ask that AEO materials be shared with its president, its Board of Managers, or any employee in sales, marketing, or engineering. The requested access is therefore confined to the one person whose role is legal, whose department is separate from the business units, and whose files the business units cannot reach.

**III. Bad Attitude's Objections Are Stereotyped and Conclusory and Do Not Satisfy Its Burden.**

To keep AEO information from in-house counsel, Bad Attitude "must make a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements that it would be harmed competitively by in-house counsel's access to the confidential information." *Irwin Indus. Tool Co.*, 2009 WL 606190, at 2. And it is "error to deny access solely because of in-house counsel's 'general position.'" *Thompson Auto. Labs* at 3. Bad Attitude has not met this burden. Each of its objections is a generalization, not a showing of fact about Mr. List.

*A. Q's size does not establish competitive decisionmaking.*

Bad Attitude's main objection is that Q is a "small organization" and that Bad Attitude's counsel "know[s] the practicality of what happens." (Exhibit C). That is the kind of stereotyped,

conclusory statement *Irwin* rejects. Bad Attitude has pointed to no fact about Q's structure, Mr. List's duties, or any past conduct showing that confidential information would reach Q's business decisionmakers. The governing test turns on counsel's actual activities and relationship with the client, not on headcount. *Thompson Auto. Labs* at 2. If company size alone were enough, every smaller company would lose the in-house participation that courts have consistently allowed. And here, Q has shown that it maintains formal separation between its legal and business functions regardless of its size.

*B. The "many hats" theory rests only on a LinkedIn profile.*

At the meet and confer, Bad Attitude asserted that Mr. List likely "wore many hats." Its apparent sole basis was Mr. List's LinkedIn page, which gives a broad description of his position at Q. (Exhibit D). A self-written, general online description of a job is no substitute for a "particular and specific demonstration of fact." *Irwin*, 2009 WL 606190, at 2. Relying on it amounts to denying access "solely because of in-house counsel's 'general position,'" which is error. *Thompson Auto. Labs* at 3. Bad Attitude has not identified any pricing, product-design, or similar competitive decision in which Mr. List advises or participates. Rather, the very nature of the section Bad Attitude touts is evidence of his use describes the general, legal nature of Mr. List's position. (List Decl. ¶ 15; Exhibit D). The description could be used to describe any in-house counsel position. Specifically, his connection with "regulatory compliance, contract negotiation, litigation, IP protection, human resources, and export control." (Exhibit D). Bad Attitude's remarks about other Q employees made no connection to competitive decisionmaking and say nothing about the one attorney whose access is at issue. (Exhibit C).

*C. The risk of inadvertent competitive use is addressed by Q's safeguards.*

Bad Attitude also raised the possibility of "inadvertent competitive use." (Exhibit C). Courts address that concern by asking whether counsel is involved in competitive decisionmaking. *Glaxo*, 796 F. Supp. at 874. Inadvertent use requires a path by which a competitor's information can reach the people making business decisions, and each of Q's safeguards closes a part of that path. First, Mr. List does not report to the president who oversees sales, marketing, quality control, software development, and engineering, so he is not in the chain through which those decisions are made. (List Decl. ¶¶ 10-11, 16). Second, the legal department is separate from those business teams, which answers Bad Attitude's concern that a company of Q's size cannot keep its functions apart. *Id.* ¶¶ 11-12. Third, AEO materials would be kept on an encrypted, legal-only system that Q's president, Board of Managers, business teams, and IT staff cannot access, so the information could not be retrieved by business personnel even by accident. *Id.* ¶¶ 12, 17. Fourth, Mr. List is bound by his ethical obligations and would be bound by the protective order, and the access Q seeks is limited to him alone. *Id.* ¶ 6, 17; Exhibit A. Bad Attitude has not explained how inadvertent use could occur within this structure. Its only basis remains a general "About" description posted on LinkedIn, which, as noted above, describes legal functions such as regulatory compliance, contract negotiation, litigation, IP protection, human resources, and export control rather than pricing or product design. (Exhibit D).

Q, by contrast, has engaged in good faith throughout. It explained its internal structure, described its encrypted legal server, provided Fourth Circuit authority on the competitive-decisionmaking test, asked Bad Attitude to identify any concrete concerns, and offered to provide relevant documentation on regulations and procedures or any other information Bad Attitude requested. (Exhibit C). Bad Attitude declined to consider those offers. A party that refuses

information that might resolve its stated concern cannot rely on that same concern as a particularized showing of harm.

## IV. Conclusion

Good cause supports entry of a protective order that lets Q's sole in-house counsel review AEO materials. Mr. List is not involved in competitive decisionmaking. Q's legal department is siloed from its business units and protected by an encrypted system that the business units cannot access. Bad Attitude has offered only stereotyped and conclusory objections based on Q's size and a LinkedIn profile. For these reasons, Q respectfully requests that the Court grant this motion and enter the protective order attached as Exhibit A, including in-house counsel as an authorized recipient of materials designated "Confidential - Attorneys Eyes Only."

Dated: November 13, 2026

Respectfully submitted,

**BELL, DAVIS, & PITT**

*s/ Marc E. Gustafson*
Marc Gustafson, N.C. Bar No. 34429
Bell, Davis, & Pitt
227 West Trade Street, Suite 1800
Charlotte, NC 28202
Tel: (704) 227-0400
mgustafson@belldavispitt.com

**EVERSHEDS SUTHERLAND (US) LLP**

Peter G. Pappas (*Admitted pro hac*)
Cameron Murphey (*Admitted pro hac*)
Melanie K. Lane (*Admitted pro hac*)
Eversheds Sutherland (US) LLP
600 Peachtree St., NE, Suite 5200
Atlanta, GA 30308
Tel.: (404) 853-8000
petepappas@eversheds-sutherland.us
cameronmurphey@eversheds-sutherland.us
melanielane@eversheds-sutherland.us

*Attorneys for Defendant/Counterclaim Plaintiff Q, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document, filed through the CM/ECF system, will be electronically served on all counsel who are registered users of CM/ECF on November 13, 2026.

This the 13th day of November, 2026.

*/s/ Marc E. Gustafson*
Marc E. Gustafson